**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:07CR401 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| ALMONDO P. TURNER, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Almondo P. Turner (Turner) (Filing No. 16). Turner is charged in the Indictment with the possession of a firearm after having been convicted of a felony (Count I) in violation of 18 U.S.C. § 922(g) and a forfeiture count regarding the firearm (Count II) pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). Turner seeks to suppress evidence obtained by the Omaha Police Department (OPD) on September 10, 2007, in Omaha, Nebraska, following a traffic stop of a vehicle in which Turner was a passenger.

Evidentiary hearings were held on Turner's motion on March 13, March 25, and April 3, 2008. Turner was present for each hearing along with his appointed counsel, Assistant Federal Public Defender Julie B. Hansen. The United States was represented by Assistant U.S. Attorney Michael D. Wellman. During the hearings, the court heard the testimony of OPD Officers Eric Goodrich (Officer Goodrich) and Anthony Petersen (Officer Petersen) and Melissa L. Carlson (Ms. Carlson). The court also received into evidence a photograph of a motor vehicle (Exhibit 1). A transcript of the hearings (TR.) was filed on April 10, 2008 (Filing No. 32).

**FINDINGS OF FACT**

In the early morning hours of September 10, 2007, Officers Goodrich and Petersen, both in uniform, were parked in a marked police cruiser at an alleyway adjacent to a gas station near 30th and Ames Streets in Omaha, Nebraska (TR. 4-5; 42). The officers were parked in that location to monitor late night activity in an area known for gun crimes and crowd disturbances (TR. 5; 43-44). Officer Petersen was the driver of the police cruiser

and Officer Goodrich was in the front passenger seat (TR. 5).  While parked, an unknown male came to the side of the police cruiser and told Officer Goodrich that a male in a blue Buick had just displayed a firearm right outside of the gas station (TR. 5).  The unknown male stated the firearm was displayed as the subject partially pulled the firearm from the subject's waistband (TR. 5).  The unknown male said the subject said he was going to shoot someone (TR. 6).  Officer Goodrich saw a blue Buick going northbound on 30th Street and Officer Goodrich asked the unknown male if that was the car (TR. 6).  The unknown male said yes and Officer Petersen started to pursue the Buick (TR. 6; 44).

Officer Petersen got behind the Buick just before the Buick reached the intersection of 30th and Sorenson (TR. 44).  As the Buick made a left-hand turn onto Sorenson, the Buick did not signal its turn (TR. 7; 45).  After the police cruiser pulled onto Sorenson, Officer Petersen activated his emergency lights to stop the Buick (TR. 45).  The Buick turned onto northbound 32nd Street and stopped (TR. 45).  Officer Petersen stopped the police cruiser directly behind the Buick (TR. 45).  The officers did not perform a felony stop which would have entailed the officers drawing their firearms as they approached and ordering the occupants out of the vehicle and to the ground (TR. 55).  The police cruiser was equipped with a video camera which engaged when the cruiser's emergency lights were activated (TR. 21).  However, no videotape of the stop was preserved (TR. 26)[1].

Officer Petersen walked to the driver's side of the Buick and Officer Goodrich walked to the passenger side of the Buick (TR. 8; 45).  Melissa Carlson was in the driver's seat and Turner was in the front passenger seat (TR. 8; 77-78).  Officer Petersen instructed Ms. Carlson to turn off the engine and roll down the driver's window (TR. 45).  Officer Goodrich made contact with Turner by talking with him (TR. 8).  When Turner started to talk with Officer Goodrich, Officer Goodrich saw Turner looking down at Turner's waistband (TR. 8).

---

[1] Officer Goodrich recalls seeing the activation light on the console before he got out of the cruiser and the red light on the camera as he looked at the cruiser front windshield when he was outside (TR. 21 -23). The video is stored on a computer in the cruiser until the cruiser arrives at the police assembly site where it is automatically uploaded to a data base at the assembly site for later viewing (TR. 23 -24).  Once uploaded, the video is no longer available to the officer in the cruiser as the video recorded in the cruiser is wiped clean for future use (TR. 25).  While at the assembly site after the arrest in this case, the officers made an attempt to view the videotape at the assembly site and found that no video had been stored on the CPU at the assembly site (TR. 26).

Officer Goodrich ordered Turner out of the car and as Turner did so, Turner reached for his waistband (TR. 8-9). Officer Goodrich ordered Turner to put his hands up and Turner kept his hands at his waistband (TR. 9). Officer Goodrich believed Turner may be reaching for a firearm in his waistband and Officer Goodrich grabbed Turner's hands to keep Turner's hands away from Turner's waistband so he couldn't draw a weapon (TR. 9). Officer Goodrich recalled being struck in the head with a fist or an elbow by Turner and he and Turner began a fight where numerous blows were struck (TR. 10). Officer Goodrich recalled hearing a "clunk," or a sound of metal hitting concrete (TR. 10). Officer Petersen immediately came to the rescue of Officer Goodrich and assisted in taking Turner to the ground (TR. 48). Officer Petersen used a lateral vascular neck restraint (LVNR) on Turner in an attempt to control Turner (TR. 34). Officer Goodrich managed to get a handcuff on Turner and OPD Officer Potter arrived at the scene and finished handcuffing Turner (TR. 59). When Turner was taken down, Turner's upper body was on the sidewalk and his lower body was on the grass away from the street (TR. 59).

Turner was searched and cocaine and vicodin were found on Turner (TR. 13). Turner was placed in the back seat of the cruiser where Officer Goodrich read *Miranda* rights to Turner (TR. 12; 37). A search of the area around the struggle was conducted by OPD Officer Gurzick and a Ruger P-94 nine-millimeter pistol was found (TR. 12; 49). Turner told Officer Goodrich that the drugs were his (Turner's) but that firearm was not his (TR. 13; 38).

Ms. Carlson testified she did not know Turner prior to the evening of September 10th (TR. 74). On the evening of September 10th, she met Turner at a friend's house (TR. 75). About thirty minutes after Turner arrived, she left to get some cigarettes and Turner accompanied her (TR. 77). Ms. Carlson recalled the time was sometime after 11 p.m. (TR. 77). Ms. Carlson stated she drove to the BP gas station at 30th and Ames where she parked outside away from the fuel pumps (TR. 78). Turner went inside by himself to get the cigarettes after Ms. Carlson gave him a $5 bill (TR. 78 -79). Ms. Carlson described Turner as calm and cool and not agitated when he went into the gas station (TR. 79). When Turner returned about five minutes later, he walked from the gas station to the car alone and did not talk to anyone (TR. 80). When Turner re-entered the car, Turner seemed

a little agitated (TR. 81).  Turner told Ms. Carlson he did not like someone whom he had seen at the store in the parking lot or in the vicinity (TR. 82).  Turner pointed the man out and told Ms. Carlson the man's name was Carlos (TR. 82 -83; 104).  Ms. Carlson then drove out of the parking lot north onto 30th Street (TR. 83).  Ms. Carlson told Turner, who was still agitated, that it was not worth getting upset about Carlos (TR. 83).  Ms. Carlson continued on 30th Street until she came to Sorenson where she made a left turn (TR. 83-84).  Ms. Carlson recalls signaling her turn and being told by Turner that a police car was following them (TR. 84).  Turner began putting on his seat belt (TR. 85).  Ms. Carlson stated Turner did not attempt to hide anything or seem nervous (TR. 84-85).  Turner told Ms. Carlson he should not have been riding with her as he had a warrant outstanding (TR. 86).  Ms. Carlson stated she was still on Sorenson when the police emergency lights came on and she turned onto 32nd Street and stopped (TR. 87).  Ms. Carlson put the car in park and waited for the officers (TR. 88).  Ms. Carlson recalls an officer appearing at both sides of the car (TR. 88).  The officer next to her asked for put her window down and turn off the car (TR. 88).  The officer next to Turner asked Turner to get out of the car and opened the passenger side car door (TR. 88).  Ms. Carlson recalled Turner attempting to undo his seat belt and the officer taking hold of Turner's arm to get him out of the car (TR. 89).  Turner got out of the car and a scuffle ensued (TR. 91-92).  Turner kept saying "I didn't do anything.  What did I do?" (TR. 94).  After other OPD officers arrived, Turner was fully handcuffed and placed in a police cruiser behind her car (TR. 97).  Thereafter, the officers asked Ms. Carlson where the gun was and for her consent to search the car (TR. 100 - 101).  Ms. Carlson gave them her consent, the officers searched the car, and no gun was found (TR. 101).  Ms. Carlson stated she was not issued a ticket nor had she seen Turner with a gun at anytime that evening (TR. 102-103).

The court, after having observed the witnesses' demeanor and considered the content of their testimony, find that Officers Goodrich and Petersen observed the blue Buick make a turn without signaling the turn onto Sorenson, a traffic violation.  Further, the court finds Officer Goodrich was the victim of Turner's assault when Turner was being removed from the passenger side of the car.

4

**LEGAL ANALYSIS**

Turner asserts he was a passenger in Ms. Carlson's vehicle on the evening of September 10, 2007, and has standing to object to his detention. Turner further asserts the traffic stop was without a warrant, probable cause, or reasonable suspicion. Turner asserts the search of the car and his detention were in violation of the Fourth Amendment. Furthermore, Turner asserts his custodial statements should be suppressed because such statements were illegally obtained and were involuntary.

In this case, the OPD officers received information from an unknown male pedestrian who observed a black male with a gun and the pedestrian said the black male was going to shoot someone. Further the pedestrian described the car and pointed out the car which drove by the officers. Police officers may make a valid investigatory stop of a vehicle based on reasonable suspicion that the occupants of the vehicle are engaged in criminal activity. **See *Terry v. Ohio***, 392 U.S. 1, 25-31 (1968); ***United States v. Sharpe***, 470 U.S. 675, 682 (1985); ***United States v. Navarrete-Barron***, 192 F.3d 786, 790 (8th Cir. 1999). The reasonable suspicion necessary to justify an investigatory stop must include "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." ***Terry***, 392 U.S. at 21; **see *Navarrete-Barron***, 192 F.3d at 790. When an investigatory stop is based upon an anonymous tip, the tip must be given weight based on its indicia of reliability as corroborated by independent police work. ***Alabama v. White***, 496 U.S. 325, 329-30 (1990). However, an anonymous tip alone may be sufficient for reasonable suspicion based on the totality of the circumstances depending on the degree of reliability. **See *United States v. McBride***, 801 F.2d 1045, 1047 (8th Cir. 1986). In this case, the blue Buick just passed the officers by and was pointed out by the tipster. Accordingly, the officers were justified in pursuing the blue Buick.

While in pursuit, the court finds Officers Petersen and Goodrich observed the vehicle in which Turner was a passenger make a turn onto Sorenson without signaling the turn. Such activity constituted a traffic violation. "[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." ***United States v. $404,905.00 in U.S. Currency***, 182 F.3d 643, 646 (8th Cir. 1999) (**citing *Pennsylvania v. Mimms***, 434

U.S. 106, 109 (1977)). "Even assuming [the police officer] was looking for [the defendant], it would be 'objectively reasonable' to pull over a vehicle which was" engaging in a traffic offense. *United States v. Miller*, 20 F.3d 926, 929 (8th Cir. 1994).

In *Maryland v. Wilson*, 519 U.S. 408, 410 (1997), the United States Supreme Court held that a police office may order a passenger in a vehicle to exit the vehicle during a valid traffic stop. The court balanced the public interest of passengers to be free from arbitrary interference by police officers with a police officer's safety applying Fourth Amendment jurisprudence. The court found that ordering a passenger out of the car constituted minimal interference as balanced against the safety of the police officer. The court cited numerous statistics of assaults and killings of police officers during traffic stops.

The report of Turner being armed combined with Turner's conduct of making gestures toward his waist and ignoring police commands to raise his arms contributed to a reasonable suspicion that Turner was engaged in criminal activity and was potentially dangerous. *United States v. Stachowiak*, 521 F.3d 852, 856-57 (8th Cir. 2008). Officer Goodrich did not violate any of Turner's rights when Turner was ordered from the car or when Officer Goodrich protected himself from Turner's assault. **See** *United States v. Sanders*, 510 F.3d 788, 789-90 (8th Cir. 2007). Turner was properly and legally detained and handcuffed for assaulting a police officer.

After Turner was placed in the police cruiser, he was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The court finds Turner's statements were voluntarily made and not the product of an illegal police action.

Turner's assertion that the recovered firearm should be suppressed is without merit. It will be for the jury to decide if Turner possessed the firearm. The firearm was recovered after the struggle with Officer Goodrich. Under various scenarios, the firearm could already have been on the ground, could have fallen from Turner's clothing or Turner could have discarded the firearm. If Turner discarded the firearm, he can have said to abandoned the firearm and has no standing to challenge the seizure of the firearm. Turner disavowed any interest in the firearm while in the police cruiser. He did so voluntarily after being advised of his *Miranda* rights. The court finds no basis to suppress the firearm from evidence in this matter.

6

The courts finds Turner's motion to suppress is without merit and should be denied in its entirety.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Turner's motion to suppress (Filing No. 16) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.   Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 16th day of May, 2008.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge